LAW LIBRARY

NO. 28935

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
GERALD OLIVEROS, Defendant-Appellant.


APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-CR NO. 07-1-1991)


MEMORANDUM OPINION
(By: Nakamura, C.J., Fujise, Leonard, JJ.)

Defendant-Appellant Gerald Oliveros (Oliveros) appeals from the Judgment entered by the Family Court of the First Circuit (family court).[1] Plaintiff-Appellee State of Hawai'i (State) charged Oliveros with second degree terroristic threatening, in violation of Hawaii Revised Statutes (HRS) §§ 707-715 and 707-717(1) (1993).[2] The complaining witness (CW)

---

[1] The Honorable Patrick W. Border presided.

[2] Hawaii Revised Statutes (HRS) § 707-715, 707-716 (Supp. 2009), and 707-717(1) provide, in relevant part:

**§707-715 Terroristic threatening, defined.** A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person . . . :

(1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

. . . .

**§707-716 Terroristic threatening in the first degree.** (1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:

(a) By threatening another person on more than one occasion for the same or a similar purpose;

(b) By threats made in a common scheme against different persons;

(c) Against a public servant . . .;

(continued...)

was Oliveros's wife.  Following a jury trial, Oliveros was found guilty as charged.  Oliveros was sentenced to probation for a term of one year, with the special condition that he serve twenty-five days in jail.

On appeal, Oliveros argues that the family court: 1) erred in admitting evidence of Oliveros's possession of a gun two weeks prior to the charged offense; 2) erred in not granting a mistrial after the Deputy Prosecuting Attorney (DPA) asked the CW whether the CW "saw [Oliveros] with a gun that you believed was not registered?"; 3) erred in allowing the mother of Oliveros's friend to testify about Oliveros's uninvited entry into a house to look for the CW on the night following the alleged offense; and 4) committed plain error in giving an instruction on terroristic threatening urged by the defense.  Oliveros also argues that there was insufficient evidence to support his conviction.

For the reasons discussed below, we affirm Oliveros's conviction.

BACKGROUND

At the time of the charged offense, Oliveros and the CW were married and living in the same house with their two children.  The CW testified that on June 30, 2007, in the evening, Oliveros, the CW, and their children went to a house in Kunia for a party.  The CW described Oliveros as looking "angry

---

2/ (...continued)
      (d)    Against any emergency medical services personnel who is engaged in the performance of duty. . . .; or

      (e)    With the use of a dangerous instrument.

. . . .

§707-717  **Terroristic threatening in the second degree.**
(1)  A person commits the offense of terroristic threatening in the second degree if the person commits terroristic threatening other than as provided in section 707-716.

most of the night." Around 11:00 p.m., the CW and Oliveros got into an argument "down the street" away from the party. According to the CW, she and Oliveros had been talking about divorce "a lot" in the weeks leading up to the party. She admitted telling the police that one of the things she and Oliveros argued about that night was her leaving Oliveros and getting a divorce because he had changed.

The CW testified that Dale "Josh" Tubon (Josh) also attended the party and that Josh was there when the CW and Oliveros were arguing. Josh and Oliveros had been best friends for a long time. After the argument, the CW returned to the party and waited, while Oliveros remained on the street with Josh. After Oliveros left the party, the CW and their two children left the party with Keiko Tubon (Keiko), Josh's wife, and went to the Tubons' house. The CW explained that she left the party with Keiko, who was the CW's good friend, because the CW "didn't wanna sleep at home with [Oliveros]" because if he was angry she "didn't wanna have to argue with him or deal with anything else."

The CW testified that Keiko told her that Oliveros said he was going to kill the CW. The CW also testified that Josh had told her that Oliveros said he was going to kill her because she "was the problem in the relationship." The CW stated that she did not know if Oliveros was serious when he made the threat "because he was angry" and "when you're angry you do -- a lot of dumb things." The CW acknowledged that while at the Tubons' home she was concerned about what Oliveros might be doing and hoped that he did not come over that night while he was still angry.

The CW testified that two weeks prior to the June 30, 2007, party, she observed Oliveros in possession of a gun. The CW initially testified that the gun was not a real gun, but an Airsoft gun, which was also referred to as an "air gun" during trial. However, she later testified that she did not know if the gun was a real gun or an Airsoft gun. The CW stated that when she had observed Oliveros in possession of the gun and at the

time of the party, she did not know whether the gun was real or an Airsoft gun. On the night of the party and the following morning, the CW's previous observation of Oliveros in possession of a "gun" was "a concern."

When the CW got to the Tubons' house, one of her friends called the police. The police arrived around 2:00 a.m. on July 1, 2007, and the CW made a written statement. The CW admitted that in her statement, she wrote that on the night of the party, she was "talking about leaving [Oliveros] and getting a divorce because he's changed." She further acknowledged writing that she went to the Tubons' house to get away from Oliveros for her safety.

The CW testified that she and Oliveros were still married, but no longer lived together. She has had time to forgive Oliveros and did not want to be testifying at his trial.

Josh testified that he was a mutual friend of Oliveros and the CW. On the evening of June 30, 2007, Josh observed Oliveros and the CW arguing, and Josh separated them. Oliveros was mad. After Josh separated the couple, the CW returned to the party while Oliveros remained outside with Josh. Oliveros told Josh that Oliveros wanted to kill the CW and that "he was gonna kill [the CW] if she tried to leave him." To help him "do that," Oliveros asked Josh to "[w]atch the kids." Oliveros further stated that "he was gonna go home to get something." Josh returned to the party and told the CW about Oliveros's "threat."

Josh admitted on direct examination by the State that he was concerned for the CW's safety on the night of the party. On cross-examination, however, Josh stated that he did not take Oliveros seriously and that Oliveros was angry and just "lettin' out his frustrations." On re-direct examination, Josh admitted that he took Oliveros's threat "a little serious" for the CW and their kids, and that he made a statement to the police because "anything can happen," and "when people are mad they do crazy stuff."

4

Josh's mother, Melissa Tubon (Melissa), testified that at the time of the charged incident, she was living with Josh and Keiko. Melissa has known Oliveros since he was in grade school and he calls her aunty. Melissa testified that on July 1, 2007, the night after the charged incident, at around 11:30 p.m., she awoke to see Oliveros standing at the foot of her bed, asking for the whereabouts of his wife and kids. Melissa stated that at that point, Oliveros was not "welcome" in the house. Oliveros immediately proceeded upstairs to search the bedrooms for the CW. When Oliveros located the CW in one of the bedrooms, he entered and closed the door. Melissa heard Oliveros ask the CW why she was not answering or returning his phone calls. The couple was "hollering" at each other so Melissa called 911.

Oliveros did not testify. The defense contended that Oliveros was simply venting to his best friend and that the alleged threat was not a "true threat" because it was conditional and premised on the CW's attempting to leave Oliveros, an event which may or may not occur in the future.

DISCUSSION

I.

Oliveros argues that the family court erred in permitting the State to introduce evidence regarding Oliveros's alleged possession of a gun two weeks prior to the date of the charged incident, because that evidence was irrelevant and inadmissible. "Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard." State v. Loa, 83 Hawaiʻi 335, 348, 926 P.2d 1258, 1271 (1996). (citations and block quote format omitted).

A.

Prior to the commencement of trial, Oliveros filed a motion in limine seeking to preclude "[r]eferences to [his] alleged possession of a gun two weeks prior to the date in question." At the pretrial hearing on motions in limine, the DPA explained to the family court that the State intended to

5

introduce evidence of two different guns: 1) an "air" gun, which was located in Oliveros's truck when he was arrested; and 2) a "real unregistered" gun, which the CW saw in Oliveros's possession two weeks prior to the charged incident. The CW apparently informed the police in her written statement that she saw Oliveros with a gun two weeks before alleged terroristic threat and that the gun was not Oliveros's gun and was not registered to him.[3] Defense counsel argued that any reference to either gun was prejudicial and irrelevant.

The family court ruled that the State would be allowed to admit evidence of the two guns, explaining that the existence of a gun would be relevant to the CW's state of mind as well as Oliveros's intent to carry out the alleged threat.

The CW's testimony about the existence of the "real" gun at trial was confusing. On direct examination by the State, the CW testified that two weeks prior to the June 30, 2007, incident, she saw Oliveros in possession of a gun that was "[n]ot a real gun[,]" but an "Airsoft gun." She said that at the time of her observation and the June 30, 2007, incident, she did not know if the gun was real or not.

On cross-examination, the CW stated that she, Oliveros, and their friends had air guns that they exchanged with each other. She allowed her five-year-old child play with air guns. The CW testified that the gun she saw in Oliveros's possession two weeks before the June 30, 2007, incident, which she had never previously seen, could have been an air gun.

On redirect examination, the CW first denied seeing Oliveros with a gun that was not an air gun two weeks before June 30, 2007. Upon further examination, the CW testified: "I don't know if [the gun] was an Airsoft gun or a real gun. I know it was a gun that was in the house." The CW further testified that between June 30, 2007, and the time of trial, she had "changed

_____

[3] The CW's written statement to the police was not made part of the record.

her mind" regarding whether she believed the gun she saw was a real gun.

### B.

Testimony regarding Oliveros's possession of a gun two weeks prior to the incident, and the CW's knowledge of that possession, was relevant to demonstrating the context and circumstances in which the threat was made. It was also relevant to showing that the threat constituted a "true threat," which is required for a terroristic threatening prosecution. See State v. Chung, 75 Haw. 398, 416-17, 862 P.2d 1063, 1072-73 (1993).

Oliveros told Josh that he "was gonna kill" the CW, and Oliveros asked Josh to "watch the kids" because "he was gonna go home to get something." When Oliveros's threats were communicated to the CW on the night of the party, the CW was concerned by her previous observation of Oliveros in possession of a "gun" two weeks prior to the party. The evidence regarding the CW's observation of Oliveros in possession of a gun two weeks prior to the charged incident was relevant to showing the context in which the threat was made, including Oliveros's statement that "he was gonna go home to get something." It was also probative of Oliveros's ability to carry out the threat and the CW's knowledge regarding that ability. The gun testimony was relevant to whether the threat constituted a "true threat" by conveying a "gravity of purpose and imminent prospect of execution." Id. at 416-17, 862 P.2d at 1073. We conclude that the family court did not err in admitting into evidence the CW's testimony regarding Oliveros's possession of a gun.

### II.

Oliveros contends that the family court erred in denying his motion for a mistrial based on the DPA's misconduct in asking the CW if she saw Oliveros with a gun the CW believed was unregistered. We conclude that any misconduct by the DPA was harmless beyond a reasonable doubt.

A.

At the pre-trial hearing on the motions in limine, the DPA represented that she would not attempt to elicit evidence that the gun possessed by Oliveros was "unregistered" or that any other laws or regulations surrounding the gun were violated.

The DPA evidently expected the CW to say that the CW saw Oliveros with a real gun two weeks before the charged incident. This is because the CW had apparently informed the police that the CW had seen Oliveros with a gun that did not belong to Oliveros and was not registered to him. As noted, however, the CW testified on direct examination that the gun she had seen Oliveros with was not a real gun but an Airsoft or air gun. On cross-examination, the CW testified that she, Oliveros, and their friends all played with air guns, which they exchanged with each other, and the CW suggested that the unfamiliar gun she had seen Oliveros with may have been an air gun belonging to one of their friends.

On redirect examination, the DPA tried to impeach the CW with a statement the CW had apparently made to the police that the gun the CW had observed in Oliveros's possession was not registered to Oliveros. The inference the DPA was evidently attempting to draw was that because an Airsoft or air gun would not need to be registered, the CW's reference to the gun as not being registered meant she was talking about a real gun. The family court held a bench conference during which the DPA's plan to impeach the CW was discussed. Unfortunately, the transcription of the bench conference is garbled, with numerous "unintelligible" portions. It appears that the question of whether the DPA could refer to the unregistered status of the gun was raised during the bench conference, but it is not clear exactly what the circuit court ruled. The family court did state:

> Motions in limine . . . is [sic] not carved in stone. Circumstances can make it so that (unintelligible) direct things which were not at issue and relevant (unintelligible) become. But I think you -- the way

8

to get around it is just did -- did you ever see a gun which you believed not to be an air gun.

. . . .

What you really wanna know is did you find a gun which wasn't an air gun but it was another kind of gun.

. . . .

You can ask that.

Following the bench conference, the following questioning took place by the DPA:

Q.    [CW], two weeks before June 30th, 2007, did you see the defendant with a gun that was not an air gun?

A.    No.

. . . .

A.    I don't know what it was.  A -- what type of gun it was that's why.

Q.    Okay.  You don't know what type of real gun or air gun it was?

. . . .

A.    I don't know if it was an Airsoft gun or a real gun.  I know it was a gun that was in the house.

[DPA]:  May I proceed, Your Honor.

THE COURT:  Depends on the question you're gonna ask.

Q. (By [DPA])  In your -- isn't it true that you saw the defendant with a gun that you believed was not registered?

Before the CW could answer the question, defense counsel objected.  The family court sustained the objection and struck the question.

After the State concluded its redirect examination of the CW, Oliveros moved for a mistrial based on the DPA's alleged violation of her promise not to attempt to elicit evidence of the unregistered status of the gun.  The family court denied the motion for mistrial.

B.

"Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." State v. Maddox, 116 Hawai'i 445, 461, 173 P.3d 592, 608 (App. 2007) (citation and internal quotation marks omitted). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, the appellate courts consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against the defendant." Id. (citation, internal quotation marks, and brackets omitted).

Although the DPA agreed pre-trial not to elicit evidence regarding the unregistered status of the gun, the DPA asked the CW whether she observed Oliveros with a gun the CW believed was unregistered. While the subject of the DPA's questioning about the gun was apparently broached again with the family court during the trial, it does not appear that the family court specifically authorized the DPA to inquire about the unregistered status of the gun. We conclude that the DPA should have sought and obtained specific authorization by the family court before forging ahead with a question that violated the pre-trial representation the DPA made in response to Oliveros's motion in limine.[4]

The DPA's question, however, prompted a defense objection that was sustained by the family court. In addition, the DPA's question did not assert that the gun was unregistered but only asked the CW if she had seen Oliveros with a gun the CW "believed" was not registered. After sustaining Oliveros's objection, the family court immediately instructed the jury that the "question is stricken" and later instructed the jury that it "must disregard entirely any matter which the court has ordered

---

[4] We do not decide whether it would have been error for the family court to authorize the DPA to question the CW about the CW's belief regarding the unregistered status of the gun, if the DPA has sought prior authorization.

10

stricken" and that "[s]tatements or remarks made by counsel are not evidence." We presume the jury followed these instructions. State v. Konohia, 106 Hawai'i 517, 528, 107 P.3d 1190, 1201 (App. 2005). Under these circumstances, we conclude that any misconduct by the DPA was harmless beyond a reasonable doubt and did not contribute to Oliveros's conviction.

III.

Oliveros argues that the family court erred in permitting Melissa to testify that 24 hours after the charged incident, Oliveros entered her house uninvited and looking for the CW. We disagree.

A.

Prior to the State's calling Melissa as a witness, defense counsel orally requested that the State make an offer of proof regarding Melissa's testimony. According to the DPA, Melissa would testify that she was present when Oliveros, without being invited, entered the Tubons' house at 11:00 p.m. on the evening following the alleged threat to search for the CW. Based on the DPA's offer of proof, the family court ruled that as long as "there's no emphasis on any potential for the illegality of [Oliveros's] presence at the [Tubons'] residence," Melissa's proffered testimony was admissible.

B.

Melissa's testimony was relevant to show the context of Oliveros's alleged threat and whether it constituted a "true threat," specifically, whether the threat conveyed "an imminent prospect of execution." See Chung, 75 Haw. at 416, 862 P.2d at 1073. Melissa's testimony established Oliveros's ability to track down the CW within twenty-four hours at another person's home. Melissa's testimony also served to illustrate the emotional and contentious nature of the relationship between the CW and Oliveros. When Oliveros located the CW, he confronted her and they began "hollering" at each other, which prompted Melissa to call 911. In compliance with the family court's in limine ruling, the DPA did not emphasize the potential illegal nature of

11

Oliveros's presence in the house, but only elicited testimony that Melissa's called 911 after she heard Oliveros and the CW arguing.[5] We conclude that the family court did not err in admitting Melissa's testimony.

## IV.

### A.

Oliveros argues that the family court committed plain error in giving the instruction on terroristic threatening that his counsel urged the family court to give. Oliveros proposed a pre-amended version of the Hawai'i Standard Jury Instructions-Criminal (HAWJIC) on second degree terroristic threatening, Instruction No. 9.32. The family court had proposed to give an instruction based on the current amended version of HAWJIC Instruction No. 9.32. However, Oliveros's counsel argued that Oliveros's proposed instruction was the "standard given in terroristic threatening cases" and represented to the family court that it was the "verbatim HAWJIC" instruction. Defense counsel specifically argued that the "relevant attributes" portion of the family court's proposed instruction was not needed and would be prejudicial to the defense. Convinced by defense counsel's arguments that Oliveros's proposed instruction was the approved HAWJIC instruction, the family court gave Oliveros's proposed instruction on second degree terroristic threatening.

Oliveros contends that the family court committed plain error in giving the terroristic threatening instruction because the instruction did not include language that whether a threat was a "true threat" is evaluated under an objective standard. Oliveros further contends that the instruction given by the family court was defective because it did not contain language advising the jury to consider the relevant attributes of Oliveros and the CW.

---

[5] Melissa testified that Oliveros was her son's best friend and was generally welcome in her house, but she indicated that Oliveros was not welcome on the night of July 1, 2007, because of the late hour and because everyone was sleeping.

12

We apply the following standard of review when evaluating jury instructions on appeal:

> When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. [However, e]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction. If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

State v. Nichols, 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006) (brackets in original) (quoting State v. Gonsalves, 108 Hawai'i 289, 292-93, 119 P.3d 597, 600-01 (2005)).

We conclude that: 1) the omission of language regarding an objective standard did not render the instructions prejudicially insufficient, erroneous, inconsistent, or misleading; and 2) the omission of language regarding "relevant attributes" was harmless beyond a reasonable doubt.

B.

During the settlement of jury instructions, defense counsel objected to the family court's proposed instruction on the charged offense of second degree terroristic threatening. The family court's proposed instruction, which was in substance the same as the current HAWJIC Instruction No. 9.32 (Adopted March 15, 2007), read as follows:

> The Defendant, GERALD OLIVEROS, is charged with the offense of Terroristic Threatening in the Second Degree.
>
> A person commits the offense of Terroristic Threatening in the Second Degree if, in reckless disregard of the risk of terrorizing another person, he/she threatens, by word or conduct, to cause bodily injury to another person.
>
> There are two material elements of the offense of Terroristic Threatening in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.

13

These two elements are:

1.     That, on or about June 30, 2007, in the City and County of Honolulu, the Defendant threatened, by word or conduct, to cause bodily injury to another person; and

2.     That the Defendant did so in reckless disregard of the risk of terrorizing that person.

The prosecution also must probe [sic] beyond a reasonable doubt that the threat was objectively capable of causing fear of bodily injury in a reasonable person at whom the threat was directed and who was familiar with the circumstances under which the threat was made, and:

(1) the threat on its face and in the circumstances in which it was made must have been so clear, unequivocal, immediate, and specific as to the person threatened, that the threat communicated a seriousness of purpose and an imminent likelihood of being carried out; or

(2) the Defendant possessed the apparent ability to carry out the threat, such that the threat was reasonably likely to cause fear of bodily injury in [the CW].

The relevant attributes of the Defendant and [the CW] must be taken into consideration in determining whether the threat, under the circumstances, was objectively capable of causing fear of bodily injury in a reasonable person.

Defense counsel objected to the family court's proposed instruction. Defense counsel argued that "according to case law . . . especially the last part where it says the relevant attributes, I can't find where that is based on any of the case laws." Defense counsel erroneously advised the family court that "according to case law," the family court's proposed instruction had been "overturned." Defense counsel further stated that defense counsel had "never seen any of this other stuff about, uh -- the defendant possessed the apparent ability to carry out the threat, that part, the relevant attributes of defendant in [sic] the complaining witness." Defense counsel argued that "those [portions of the instruction] are not needed. And it's <u>prejudicial really</u> and it's really confusing to the jury." (Emphasis added.)

Defense counsel requested that the family court instead give Oliveros's proposed instruction. Oliveros's proposed instruction was based on the pre-amended version of HAWJIC

14

Instruction No. 9.32.[6/] The State objected to the Oliveros's proposed instruction and requested that the family court's proposed instruction be given. Defense counsel, however, represented to the family court that Oliveros's proposed instruction was the "verbatim HAWJIC" instruction. Convinced by defense counsel's arguments that Oliveros's proposed instruction was the "approved" HAWJIC instruction, the family court granted Oliveros's request, over the State's objection, and gave the jury Oliveros's proposed instruction as follows:

> The defendant[,] Gerald Oliveros[,] is charged with the offense of terroristic threatening in the second degree.
>
> A person commits the offense of terroristic threatening in the second degree if[,] in reckless disregard of the risk of terrorizing another person[,] he threatens, by word or conduct[,] to cause bodily injury to another person.
>
> There are two material elements of the offense of terroristic threatening in the second degree, each of which the prosecution must prove beyond a reasonable doubt.
>
> These two elements are:
>
> 1. That[,] on or about June 30, 2007, in the City and County of Honolulu, the defendant threatened[,] by word or conduct[,] to cause bodily injury to another person; and
>
> 2. That the defendant did so in reckless disregard of the risk of terrorizing that person.
>
> The threat on its face and in the circumstances in which it is made must be so unequivocal, unconditional, immediate, and specific as to the person threatened[,] as to convey a gravity of purpose and an imminent prospect of execution.

### C.

Through the conduct of his counsel, Oliveros clearly invited the alleged errors of which he now complains. However, the Hawai'i Supreme Court has held that "it is ultimately the trial court that is responsible for ensuring that the jury is properly instructed." Nichols, 111 Hawai'i at 335, 141 P.3d at 982. In Nichols, the supreme court stated:

---

[6/] HAWJIC Instruction No. 9.32 was revised on March 15, 2007. Settlement of jury instructions took place on December 5, 2007.

> This court has acknowledged that, as a general rule,
> invited errors are not reversible. However, we have
> also noted that the general rule is inapplicable where
> an invited error is so prejudicial as to be plain
> error or to constitute ineffective assistance of
> counsel. In other words, we are cycled back to our
> original inquiry.

Id. at 339 n.7, 141 P.3d at 986 n.7 (citations omitted). Thus, we turn to examine Oliveros's claim that the terroristic threatening instruction given to the jury was erroneous.

D.

The deficiencies claimed by Oliveros in the terroristic threatening instruction given by the family court relate to the "true threat" requirement. That requirement has been judicially imposed on offenses criminalizing threatening communications to ensure that prosecutions based on a defendant's communications do not violate the First Amendment right of free speech.

In Chung, 75 Haw. 398, 862 P.2d 1063, the Hawaiʻi Supreme Court addressed the question presented in United States v. Kelner, 534 F.2d 1020 (2d Cir. 1976), of "whether an unequivocal threat which has not ripened by any overt act into conduct in the nature of an attempt is nevertheless punishable under the First Amendment, even though it may additionally involve elements of expression." Chung, 75 Haw. at 415, 862 P.2d at 1072 (quoting Kelner, 534 F.2d at 1026). To avoid infringing on First Amendment protections, the Kelner court narrowed the definition of the term "threat," as used in an offense prohibiting the transmission of a threatening communication, to exclude statements, which taken in context, are not "true threats." Kelner, 534 F.2d at 1027.[2] In Chung, the Hawaiʻi Supreme Court quoted extensively from the Kelner court's explanation for and formulation of the true threat requirement:

> As a part of the Government's constitutional responsibility
> to insure domestic tranquility, it is properly concerned --

---

[2] In Kelner, the defendant was prosecuted for violating 18 U.S.C. § 875(c), which prohibits, among other things, the transmission in interstate commerce of a communication containing a threat to injure the person of another. Kelner, 534 F.2d at 1020.

> in an era of ever-increasing acts of violence and terrorism, coupled with . . . opportunities to carry out threats of injury -- with prohibiting as criminal conduct specific threats of physical injury to others . . . .
>
>     . . . .
>
> [T]he word "threat" . . . exclude[s] statements which are, when taken in context, not "true threats" because they are conditional and made in jest [citing Watts v. United States, 394 U.S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed. 2d 664 (1969)]. . . . [T]hreats punishable consistently with the First Amendment [are] only those which according to their language and context conveyed a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected "vehement, caustic [and] unpleasantly sharp attacks . . . ." [Citation omitted.]
>
> . . . [P]roof of a "true threat" . . . focus[es] on threats which are so unambiguous and have such immediacy that they convincingly express an intention of being carried out. . . .
>
> . . . So long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution, the statute may properly be applied.

Chung, 75 Haw. at 416-17, 862 P.2d at 1072-72 (brackets and ellipsis points in original; emphasis in original omitted; and emphasis added) (quoting Kelner, 534 F.2d at 1026-27).

    In State v. Valdivia, 95 Hawai'i 465, 24 P.3d 661 (2001), the Hawai'i Supreme Court explained its holding in Chung as follows:

> . . . Chung judicially narrowed the meaning of the word "threat," as employed in HRS § 707-715, in order to salvage the statutes defining terroristic threatening offenses from unconstitutional overbreadth. As a result, Chung mandates that, in a terroristic threatening prosecution, the prosecution prove beyond a reasonable doubt that a remark threatening bodily injury is a "true threat," such that it conveyed to the person to whom it was directed a gravity of purpose and imminent prospect of execution. In other words, the prosecution must prove beyond a reasonable doubt that the alleged threat was objectively capable of inducing a reasonable fear of bodily injury in the person at whom the threat was directed and who was aware of the circumstances under which the remarks were uttered.

Valdivia, 95 Hawai'i at 476, 24 P.3d at 672 (2001).

    In Valdivia, the trial court instructed the jury that "to constitute a threat punishable by law, the threat on its face and in the circumstances in which it is made must be so

unequivocal, unconditional, immediate, and specific as to the person threatened as to convey a gravity of purpose." Id., at 478, 24 P.3d at 674 (brackets omitted).  The trial court's instruction tracked the language of Chung, except that the final phrase in the Chung articulation of the true threat requirement, namely, "and imminent prospect of execution," was omitted. Id. The supreme court held that the omission of this phrase rendered the instruction deficient. Id.  The court stated that "[a]bsent some appropriate language regarding 'imminency,' we cannot say that the jury was sufficiently instructed with respect to differentiating a 'true threat' from constitutionally protected free speech." Id. (citation omitted).

The Valdivia court also held that the trial court's terroristic threatening instruction was deficient because it failed to include language directing the jury to consider the relevant attributes of the defendant and the complainant. Valdivia was charged with terroristic threatening based on his threatening a police officer while Valdivia was handcuffed. Id. at 471, 24 P.3d at 667.  The trial court had refused Valdivia's proposed instruction that "where a threat is directed at a police officer, you may consider that police officers are trained to a professional standard of behavior that ordinary citizens might not expected to equal." Id. at 479, 24 P.3d at 479 (brackets omitted).  The supreme court concluded:

> the jury in the present matter should have been instructed that it could consider relevant attributes of both the defendant and the subject of the allegedly threatening utterance in determining whether the subject's fear of bodily injury, as allegedly induced by the defendant's threatening utterance, was objectively reasonable under the circumstances in which the threat was uttered.

Id. at 479, 24 P.3d at 675.

### E.

Oliveros contends that the terroristic threatening instruction given by the family court was deficient because it

18

failed to instruct the jury to evaluate whether the threat was a "true threat" under an objective standard. Quoting language from Valdivia, 95 Hawai'i at 477, 24 P.3d at 672, Oliveros argues that the family court should have instructed the jury that "the threat was objectively susceptible to inducing fear of bodily injury in a reasonable person at whom the threat was directed and who was familiar with the circumstances under which the threat was uttered."

We conclude that the objective standard Oliveros argues was erroneously omitted from the instruction was effectively subsumed within and covered by the instruction given by the family court. The family court, based on Chung, instructed the jury that: "The threat on its face and in the circumstances in which it is made must be so unequivocal, unconditional, immediate, and specific as to the person threatened[,] as to convey a gravity of purpose and an imminent prospect of execution."

In Valdivia, the supreme court read the true threat language in Chung as imposing an objective standard.

> Chung mandates that, in a terroristic threatening prosecution, the prosecution prove beyond a reasonable doubt that a remark threatening bodily injury is a "true threat," such that it conveyed to the person to whom it was directed a gravity of purpose and imminent prospect of execution. In other words, the prosecution must prove beyond a reasonable doubt that the alleged threat was objectively capable of inducing a reasonable fear of bodily injury in the person at whom the threat was directed and who was aware of the circumstances under which the remarks were uttered.

Id. at 476, 24 P.3d at 672. Neither Valdivia nor any other Hawai'i Supreme Court case has overruled Chung. We conclude that a threat that satisfies the Chung requirements for a true threat would also satisfy the objective standard set forth in

<u>Valdivia</u>.[8/]  Thus, the family court's use of language taken directly from <u>Chung</u> to explain the "true threat" requirement did not render the instruction prejudicially insufficient, erroneous, inconsistent, or misleading.

F.

Oliveros argues that the terroristic threatening instruction given by the family court was defective because it did not contain language advising the jury to consider the relevant attributes of Oliveros and the CW.  Oliveros did not specifically raise this claim in his points of error, and we could therefore reject this claim for noncompliance with HRAP Rule 28 (2008).  <u>See</u> HRAP Rule 28(b)(4) ("Points not presented in accordance with this section [regarding points of error] will be disregarded . . . .")

In any event, we conclude that any error in failing to instruct the jury on relevant attributes was harmless beyond a reasonable doubt.  The record shows that Oliveros's counsel believed that the giving of a relative attributes instruction would be <u>prejudicial</u> to Oliveros's defense.  That is why Oliveros's counsel asked for an instruction that omitted the relevant attributes language.  Obviously, Oliveros was not

---

[8/] In the context of discussing the "imminency" requirement for a true threat, the <u>Valdivia</u> court noted that one means of satisfying the objective standard for a true threat would be to satisfy the <u>Chung</u> requirements:

> We agree with the California Supreme Court that the "imminency" required by <u>Kelner</u>, and hence by <u>Chung</u>, can be established by means other than proof that a threatening remark will be executed immediately, at once, and without delay.  Rather, as a general matter, the prosecution must prove that the threat was objectively susceptible to inducing fear of bodily injury in a reasonable person at whom the threat was directed and who was familiar with the circumstances under which the threat was uttered.  Of course, <u>one means of proving the foregoing</u> would be to establish, as in <u>Chung</u> and <u>Kelner</u>, that the threat was uttered under circumstances that rendered it "so unequivocal, unconditional, immediate, and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." <u>See Chung</u>, 75 Haw. at 416-17, 862 P.2d at 1073; <u>Kelner</u>, 534 F.2d at 1026-27.

<u>Valdivia</u>, 95 Hawai'i at 477, 24 P.3d at 673 (brackets and certain citations omitted) (emphasis added).

relying on the relative attributes of the parties to argue that the alleged threat was not a true threat.[9/] We conclude that the omission of a relevant attributes instruction that would have directed the jury to consider a factor that Oliveros himself felt was harmful to his case and was not a basis for his defense was harmless beyond a reasonable doubt.

V.

We reject Oliveros's claim that there was insufficient evidence to support his conviction. When viewed in the light most favorable to the prosecution, State v. Meyers, 112 Hawai'i 278, 286, 145 P.3d 821, 829 (App. 2006), there was sufficient evidence to establish that Oliveros's threat was a true threat which conveyed a "gravity of purpose and imminent prospect of execution," Chung, 75 Haw. at 416-17, 862 P.2d at 1073, and that Oliveros recklessly disregarded the risk that his threat would terrorize the CW.

The evidence showed that in the weeks leading up to the party, Oliveros and the CW had been discussing getting a divorce. At the party, the CW and Oliveros argued about her leaving him and getting a divorce because he had changed. Following their argument, Oliveros told Josh that Oliveros was going to kill the CW "if she tried to leave him." Oliveros asked Josh to "[w]atch the kids" and said that he was going to go home to get something. The CW had seen Oliveros with a gun, which may have been a real gun, in their home about two weeks prior to the charged incident. Josh, Oliveros's best friend, was sufficiently concerned about

---

[9/] In closing argument, Oliveros argued that he was not guilty because he was merely "venting" in a private conversation with Josh, his long-time best friend, when he made the alleged threat. This argument focuses on the likelihood that Josh would communicate the threat to the CW and thus whether Oliveros recklessly terrorized the CW by making the threatening statement to Josh. In addition, Oliveros argued that the alleged threat -- that Oliveros would kill his wife if she tried to leave him -- was not a true threat because it was phrased in language that was conditional and not immediate. Neither of Oliveros's arguments relate to the relative attributes of Oliveros and the CW.

the risk posed by Oliveros's threat that he warned the CW. The CW, in turn, took the threat seriously enough that she made a statement to the police that evening and she stayed at the Tubons' house to avoid Oliveros. The evening after Oliveros threatened to kill the CW, he appeared at the Tubons' house late at night looking for the CW. When Oliveros located the CW, they got into a heated argument and the police were called. Taking into account all the circumstances surrounding the threat, the jury could have reasonably concluded, based on substantial evidence presented at trial, that Oliveros was guilty of the charged offense.

We are unpersuaded by Oliveros's contention that because the threat of harm was stated as if it were conditioned on a future occurrence, namely, the CW's trying to leave Oliveros, that it was not a true threat. Simply making a threat in conditional language does not preclude it from being a true threat. See People v. Brooks, 31 Cal. Rptr. 2d 283, 285-88 (Cal. Ct. App. 1994). The test is whether the threat on its face and in the circumstances in which it is made is "so unequivocal, unconditional, immediate, and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." Chung, 75 Haw. at 416-17, 862 P.2d at 1073. Given the context in which the threat was made, we conclude that a reasonable jury could conclude that, despite the conditional language, the threat conveyed a "gravity of purpose and imminent prospect of execution." Id. In any event, prior to the threat, the CW and Oliveros argued about the CW's leaving Oliveros and getting a divorce. Therefore, the jury could have inferred that the stated condition, "if she tried to leave [Oliveros]," had been satisfied.

CONCLUSION

We affirm the Judgment entered by the family court on December 6, 2007.

DATED:  Honolulu, Hawai'i, August 31, 2010.


Craig W. Jerome
(Taryn R. Tomasa, on the briefs)
Deputy Public Defenders
for Defendant-Appellant

Stephen K. Tsushima
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

Chief Judge

Associate Judge

Associate Judge

23